Estate of George L. Bradbury, Fern L. Bradbury, Executrix v. Commissioner.
Estate of George L. Bradbury v. Commissioner
Docket No. 5288.
United States Tax Court
1946 Tax Ct. Memo LEXIS 83; 5 T.C.M. (CCH) 788; T.C.M. (RIA) 46219; September 13, 1946
*83 Held, an assignment of property by decedent to his wife was made in contemplation of death, within the purview of section 811 (c), Internal Revenue Code. Arthur Murray, Esq., and John T. Riley, Esq., 427 Title Insurance Bldg., Los Angeles, Calif., for the petitioner. H. A. Melville, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined a deficiency of $31,473.85 in Federal estate tax. The sole controverted issue arises from the respondent's finding that certain transfers made to the decedent's wife on March 30, 1940, were in contemplation of death, within the purview of section 811 (c) of the Internal Revenue Code. Adjustment is *84 also necessary on account of certain deductions to which petitioner is entitled. Findings of Fact The decedent, George L. Bradbury, was born August 16, 1899, and died May 31, 1941, at the age of 41 years. At the time of his death he was a resident of Tucson, Arizona, and the estate tax return was filed with the collector for the district of Arizona. The immediate cause of death, as noted on the death certificate, was chronic pulmonary tuberculosis of six years' duration. Another condition noted in the death certificate was empyema of 15 years' duration. The decedent left surviving him Fern Lucille Bradbury, his widow, of the same age as decedent, and George L. Bradbury, Jr., an only child born September 15, 1926. In October 1920, decedent entered Pottenger's Sanatorium at Monrovia, California, with tuberculosis of the lungs, mostly in the right lung, which had a cavity in the upper portion. At the time he entered the Sanatorium he weighed 134 pounds. During his stay there he ran a temperature of between 100 and 102 degrees most of the time, sometimes higher. He was a bed patient most of the time and weighed about 115 pounds when he left in the spring of 1923. At this time his *85 condition was not good. Tuberculosis was active both at the time of his arrival at the Sanatorium and at the time he left. While in the Sanatorium he developed sinus pneumothorax (defined as air in the pleural cavity). The right pleura became infected with tuberculosis, causing what is called empyema, or pus in the pleura from which there was a drainage. In draining off the empyema with a needle, one of the openings became infected with tuberculosis and enlarged considerably so that it drained of its own accord and continued to discharge throughout his life. Upon leaving this Sanatorium during 1923, the decedent went to Tucson, Arizona. At that time he was a sick man and very frail. From that time until the date of his death he was quite slender, his weight varying from time to time. After a year or two spent in Arizona the tuberculosis became arrested and decedent's condition improved. While in Tucson decedent met and married his wife, Fern Lucille Bradbury now, by reason of a remarriage, Fern Silva. At that time she was employed as a stenographer and bookkeeper in a bank and trust company. At the time of his marriage the decedent's tuberculosis was arrested and he was enjoying *86 comparatively good health. Before the marriage, Fern Bradbury, hereinafter sometimes called the widow, made inquiries of physicians and others as to the advisability of marrying the decedent. Being assured that since his tuberculosis was then arrested there was no danger at that time, she married the decedent on December 6, 1925. The decedent was an only child, whose parents both died while he was a child. His father left an estate of approximately a half million dollars in trust for the decedent at the Northern Trust Company in Chicago, one-half of the corpus of which was distributed to the decedent when he reached the age of 25 years (1924) and the other half of which was distributed on his reaching the age of 30 years (1929). After the trust property was distributed to the decedent he left it with, and in charge of, the Northern Trust Company in a custodian or agency account. So far as the record shows, the decedent was never actively occupied in any business. He regularly received income from the Trust Company, the same constituting his sole income and being derived from securities, rentals from real estate, and interest on mortgages and loans held by the Trust Company. *87 Shortly after the birth of decedent's son on September 15, 1926, decedent started to run a temperature and was put to bed, where he remained for nearly a year. Throughout his life, after marrying, the decedent maintained active interests in giving aid to crippled children; in travel; and in the collection of stamps. He was also active in Masonic affairs and charitable work of the Mystic Shrine. During the period 1925 to 1938, decedent and his wife spent every winter in Arizona because of his health and because of the intense heat in Arizona, spent every summer in some other place. They made four trips to Honolulu, one to New Zealand, one through the Canal Zone to New York, and one to British Columbia. The winters of 1930-1940 and 1940-1941 were spent in Los Angeles. The decedent also took many automobile trips. The decedent was a sociable person and he and his wife did considerable entertaining while living in Tucson. He left Tucson in the spring of 1939 and never returned there. The decedent was of a proud nature and did not wish others to consider him an invalid. He was also a very intelligent man and enjoyed conversations with other persons. Although he fully realized his *88 condition, he was optimistic as to the future. His friends were considerate of him and never discussed his physical condition in his presence. In August 1936, after their return to San Francisco from Honolulu, the decedent entered a hospital in that city for an operation called thoracoplasty, which is the removal of parts of ribs overlying the infected area of the lung. The operation did not cure the condition to which it was directed and drainage from the lung continued. The decedent and his wife were not settled in any of the large cities on the west cost for any long period of time after May 1938, until the early part of 1940. During this period the decedent made a few short trips to Los Angeles and drove to San Diego and to San Francisco. In the fall of 1939 the decedent, having decided to spend the winter in Los Angeles, took a small apartment there while his wife returned to Tucson for the purpose of either renting or closing their home for the winter. She joined the decedent just prior to Christmas, 1939. In June, 1940 the practical nurse who had been attending the decedent during his residence in Los Angeles left her employment and decedent's physician suggested that *89 he enter a sanatorium. Accordingly, he entered the California Hospital in Los Angeles as a chronic patient. In November, 1940 the superintendent of the hospital told the decedent's wife that the hospital was not equipped to take care of long-time patients with chronic tuberculosis and that the decedent would have to leave the hospital. The decedent accordingly moved to the Cottage Sanatorium in Tujunga, California, where he remained until his death, May 31, 1941. During May, 1938 the decedent and his wife had a quarrel involving certain letters written to the decedent by another woman. The decedent's wife threatened to divorce him. A mutual friend was called into the situation and a conference was held. After much discussion, the decedent promised to make her financially independent and she agreed to give up all thoughts of divorce. Early in the spring of 1940 the decedent began looking about in Los Angeles for someone to advise him with respect to financial matters. A friend recommended John T. Riley, an attorney, now of counsel in this proceeding. Shortly thereafter Riley was engaged and in March, 1940 went to the decedent's apartment. At the time the decedent was in bed and *90 a nurse was in attendance. During the conversation the decedent told Riley that he wanted to transfer approximately half of his property to his wife as a separate estate. As a result of the conference Riley prepared three instruments: a declaration of trust, an assignment, and the last will and testament of George L. Bradbury. In the trust, which was revocable, the decedent was the grantor and the decedent's wife was the trustee. By its terms the sum of $100 per month was to be paid to a certain Maud Stephenson and all the balance of the income was to be paid to the decedent during his lifetime. The instrument provided that upon the death of the trustor, the trustee, in her discretion, "may pay out of income and/or principal any part or all of the last illness and burial expenses of the Trustor". It also provided for distributions after the death of the trustor to his son, to whom was to be distributed ultimately the principal of the trust. The assignment reads as follows: FOR VALUE RECEIVED, I GEORGE L. BRADBURY, do hereby assign, transfer and set over unto FERN L. BRADBURY all of my right, title and interest to the properties, both real and personal, now held by the Northern *91 Trust Company of Chicago, Illinois, in their Agent Account No. 6022. (signed) George L. Bradbury. Dated March 30th, 1940. ASSIGNEE'S ACCEPTANCE I, FERN L. BRADBURY, do hereby accept the above assignment of properties held by the Northern Trust Company in their Agent Account No. 6022. (signed) Fern L. Bradbury Address: 2304 E. Speedway Tucson, Arizona
Dated March 30, 1940. The decedent's last will and testament was in the following form: I, GEORGE L. BRADBURY, of the City of Tucson, County of Pima, State of Arizona declare this to be my last Will and revoke all former Wills: FIRST: I declare that I am married and that my wife's name is FERN L. BRADBURY, and that I have only one child, issue of that marriage, namely my son, GEORGE LEWIS BRADBURY, JR. SECOND: I give, devise, and bequeath all of my property, real and personal, wheresoever sittuate to my beloved wife, FERN L. BRADBURY. Having otherwise provided for my son by a trust, I am omitting any provision in this Will for him. THIRD: I appoint as Executor hereof my beloved wife, FERN L. BRADBURY, and direct that she serve without bond. Dated March 30th, 1940. (signed) George L. Bradbury. All three of *92 the above documents were signed by the respective parties and duly executed on March 30, 1940. Attached to the trust agreement above mentioned was a list of various securities, bonds, etc., transferred and placed in trust by the instrument. A gift tax return was filed showing the sum of $255,693 as the value of the gift to the decedent's wife. In filing a Federal estate tax return, the widow, as executrix, included the revocable trust in the gross estate as a transfer during decedent's life at a value on March 31, 1942, the optional valuation date, of $173,370.40. No other property of any kind or description was included in the gross estate. Schedule G also reported, "Gifts to Fern L. Bradbury 3-30-1940 not taxable, per schedule G-2 attached; Value $263,420.17." After deducting a charitable bequest of $150, funeral expenses of $1,147.77, attorneys' fees of $2,500, and miscellaneous debts of $67.50, and also taking the specific exemption of $100,000, a net estate of $69,505.13 was reported, on which a tax in the amount of $15,294.17 was paid. Under date of March 12, 1945, a further payment of $15,000 was made. On January 31, 1945, the petitioner paid an estate tax collector for *93 the State of Arizona the sum of $7,817.07. The petitioner also incurred additional expenses in legal fees, traveling expenses for witnesses, and hotel expenses for witnesses. The transfer of property of an agreed value of $262,520.81 by the decedent to his wife, effected by the assignment hereinabove referred to, was made in contemplation of death. Opinion VAN FOSSAN, Judge: The petitioner submits that on the above facts the respondent erroneously held that the transfer of property by the decedent to his wife on March 30, 1940, by means of the assignment, was a transfer made in contemplation of death, within the meaning of that term as used in section 811 (c) of the Internal Revenue Code. We are unable to agree and have accordingly found to the contrary. In this case we have a man who had been a chronic invalid for years so completely disposing of approximately a half million dollars worth of property by a deed of trust and an assignment that no probate of his estate was necessary. The deed of trust, though revocable, speaks in terms of finality and makes many references to the death of the trustor, inter alia, providing for the payment of the expenses *94 of the last illness and burial of the trustor, the decedent here. Though the property transferred by the deed of trust was included in the estate in its return, since the instrument was prepared at the same time by the same party, and executed on the same day as the assignment here in question, we may properly examine it and contemplate its effect to assist in determining the decedent's state of mind on March 30, 1940. More persuasive of the decedent's state of mind is the fact that on the same day he made the transfers of property he also signed and executed his last will and testament. See Estate of Addison W. Ingleheart, 28 B.T.A. 888, affirmed 77 Fed. (2d) 704. In this will he left everything to his wife, stating "having otherwise provided for my son by a trust, I am omitting any provision in this will for him." From all the evidence bearing on the state of the decedent's health, the drafting and execution of the three instruments and all the facts deemed pertinent, we have concluded that the respondent held correctly that the decedent on March 30, 1940, when he executed the assignment transferring approximately one-half of his property to his wife, *95 was in a testamentary frame of mind and that the transfer so effected was in contemplation of death. The petitioner submits that "the impelling cause of the transfers here in question was the desire of the decedent to carry out the promise he had made to his wife during May, 1938" to make her financially independent if she would give up all thought of divorce. We are unable to agree that the transfer was so related to the family quarrel which occurred almost two years before. The form of the instrument of transfer, the omission of any reference to the alleged consideration, the absence of any mutual covenants, various gaps in the testimony about the quarrel, the passing of two years without action, all are factors that tend to weaken the emphasis to be attributed to the facts of the disagreement. But even if it were conceded that the transfer was in some way related to the family quarrel, we would still find it necessary to hold that in making the actual transfer in 1940, the decedent was in a testamentary frame of mind. In the recomputation under Rule 50 adjustment will be made for the additional items of expense as agreed upon by the parties. Decision will be entered under *96 Rule 50.